*Brandon Parks v. State of Maryland*, Nos. 26 & 27, Sept. Term 2023. Opinion by Tang, J.

**CHILD SUPPORT – ENFORCEMENT – EVIDENCE – WEIGHT AND SUFFICIENCY**

Section 10-203(a) of the Family Law Article ("FL"), Maryland Code (1984, 2019 Repl. Vol.) provides that "[a] parent may not willfully fail to provide for the support of his or her minor child." "Willful" is not defined in the statute. Considering the legislative history and decisional law, we interpret "willful" under FL § 10-203(a) as an act done with deliberate intention for which there is no reasonable excuse.

To support a conviction for willful failure to pay child support under FL § 10-203(a), there must be evidence from which the trier of the facts can determine that the obligor parent intentionally refused to support their child despite having the capacity to do so. Willful failure to support presupposes the existence of, or the ability to obtain, the means of support by the parent. In other words, the obligor parent must have the means of paying support *or* the capacity to obtain the means of paying support. Willfulness may be proven by circumstantial evidence and by inferences drawn therefrom.

The evidence was sufficient to establish that the appellant willfully failed to pay child support under FL § 10-203(a) in two cases. In the first case, the evidence demonstrated that the appellant worked about 10 to 15 monthly jobs, paid rent, and did not use any funds to pay child support during the relevant period. The evidence also showed that the mother prevented the appellant from contacting her and from visiting the child, from which the jury could have inferred that the appellant chose not to pay support.

In the second case, the evidence established that the appellant worked for one employer, earning about $500 a month during the relevant period, and he also worked for others. Despite his income and ability to work, he made no child support payments during the relevant period.

Circuit Court for Kent County
Case Nos.: C-14-CR-22-000092 & C-14-CR-22-000093

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

Nos. 26 & 27

September Term, 2023

_____

BRANDON PARKS

v.

STATE OF MARYLAND

_____

Reed,
Tang,
Eyler, James R.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Tang, J.

_____

Filed: August 28, 2024

* Kehoe, S., J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

This consolidated appeal involves two cases in which the appellant, Brandon Parks, was convicted in the Circuit Court for Kent County of willfully failing to provide child support for two of his minor children in violation of § 10-203(a) of the Family Law Article ("FL"), Maryland Code (1984, 2019 Repl. Vol.). The sole issue in each case is whether there was sufficient evidence of willfulness.[1] We hold that there was and affirm the convictions in both cases.

## BACKGROUND

The appellant has two minor children with different mothers. He was court-ordered to pay monthly child support for each child. The Kent County Office of Child Support Enforcement ("OCSE") tracked the child support payments made by the appellant. There is no dispute that, in both cases, the appellant made no child support payments during the relevant periods.

In June 2022, the State charged the appellant with willfully failing to pay child support in each case. The trials were scheduled in December 2022 to be tried one after another. The first case, C-14-CR-22-000092, was a jury trial, while the second case, C-14-CR-22-000093, was a bench trial. The cases were tried similarly: the State presented testimony of the children's mothers ("Mother 1" and "Mother 2"), Lindsay Blume (the "OCSE representative"), and Philip Boudart, the appellant's employer (the "employer"). The appellant testified in the first case but not in the second case. Copies of the pertinent

---

[1] As drafted, the appellant's question presented is: "In C-14-CR-22-000092 and C-14-CR-22-000093, was the evidence legally insufficient to establish that [the appellant] willfully failed to provide for the support of his minor children?"

child support orders and OCSE payment records were admitted in each case. A summary of the relevant evidence presented in each case is as follows:

## First Case: C-14-CR-22-000092

The appellant is the father of a six-year-old child who lived with Mother 1 under her sole custody. Mother 1 and the appellant had a brief relationship but have had little contact since the child's birth. When the child was one month old, the appellant bought diapers. When the child was three months old, Mother 1 attempted to allow the appellant visitation, but he knocked the child's stroller over. Since then, Mother 1 has not permitted the appellant to see the child. She testified that she did not want the child to "be around [the appellant] because he was threatening [Mother 1] at the current time when [she] had a protective order against him." Mother 1 prevented the appellant from contacting her by blocking him on social media.

A court order issued in April 2021 required the appellant to pay Mother 1 $780 in monthly child support beginning in May 2021. The OCSE representative testified that the appellant had been referred to a program aimed at helping him secure employment. However, he failed to comply with the program requirements and became ineligible for its services.

The appellant made no payments through the OCSE from May 2021 to May 2022 ("the nonpayment period"). During this period, no wages were garnished, and no cash was collected directly from the appellant. The appellant also did not directly pay child support to Mother 1 during that time.

During the nonpayment period, the appellant worked part-time for the employer who owned properties in Kent County. The appellant performed various home improvement projects on those properties, including landscaping, general labor, carpentry, and construction. The appellant worked about 10 to 15 monthly jobs, which amounted to one to four workdays per week. The employer paid the appellant through an electronic payment application and testified that the appellant never indicated that he had not received a payment.

The employer allowed the appellant to rent one of his homes beginning "in January of last year."[2] The appellant paid the employer $800 per month in rent, a reduced rate from the property's market value rent of around $1,700 a month due to undergoing renovations. During the nonpayment period, the appellant did not have a valid driver's license. The employer testified that this limited the appellant's ability to work for him, so he wrote a letter supporting the appellant's efforts to renew his license to increase his productivity. When asked how the appellant would get to the job sites, the employer explained that the appellant "owns a car now. Previously he would get rides from other workers or myself or be working at my property that he is staying at."

At the close of the State's case, defense counsel made a motion for judgment of acquittal, asserting that the State had failed to demonstrate the appellant's ability to pay the ordered child support. The defense argued that there was no evidence that the appellant

---

[2] It seems that the employer meant January 2021 when he stated January "of last year" at the trial in December 2022. In the second trial, *infra*, the employer testified that the appellant started renting in January 2022.

3

made any money, no evidence of his finances, and thus no evidence that he was willful in not paying child support during the nonpayment period.

The court denied the motion, explaining that although there was no testimony about how much or when the appellant was paid, the evidence showed that he was employed during the nonpayment period and that none of his payments went toward his child support obligation.

The appellant proceeded to testify in his defense. He explained that during the nonpayment period, he tried to exercise "visitation rights" with the child and "see if she needed anything" multiple times, but Mother 1 did not allow him to see the child and "blocked" his attempts to contact her. The appellant confirmed he was not disabled or homeless during the nonpayment period. He also testified that he made a $1,150 payment to OCSE with funds lent by the employer, but the payment was made after the nonpayment period, likely in June 2022.

During closing arguments, the State argued that the appellant willfully failed to pay child support despite being capable of making some payment during the nonpayment period. Even though the appellant's financial ability to pay child support is not an element of the offense, the State emphasized that the appellant could work. He was not disabled or homeless. He was employed and earning income from various jobs each month.

The defense argued that the appellant did not have the funds to pay child support. There was no evidence of how much money he had made or that he could have made any payments toward his child support obligation. The defense explained that the appellant "can't willfully not want to give her something he doesn't have." The appellant tried to

4

contact Mother 1 to see the child and check if she needed anything, but she did not allow it. The defense explained that this "makes it hard for [the appellant] to try to support her."

The jury convicted the appellant of willful failure to pay child support. The court sentenced him to one year of incarceration and suspended all but 90 days, to be served on weekends, followed by five years of probation.

## Second Case: C-14-CR-22-000093

The appellant is the father of a second child, who was thirteen years old at the time of trial. The child lived with Mother 2, who had sole custody of the child. Mother 2 and the appellant were married for seven years. They divorced but maintained a "friendly" relationship. The appellant was allowed visitation with the child, which amounted to one or two weekends per month, some holidays, and some days over summer break.

By court order, entered June 2010, the appellant was required to pay $282 per month in child support. According to OCSE's records, the appellant made payments in 2019; the last payment was in September 2021. No payments were made through OCSE from October 2021 through May 2022 ("the nonpayment period"). Additionally, the appellant had no wages garnished during this time and did not directly pay Mother 2 any child support. The appellant often offered to help Mother 2 with the child's clothing and school supplies and would say to Mother 2, "[I]f you need anything, let me know. If I have it, I'll help you. If I don't, then we'll make arrangements." Mother 2 did not accept his offers.

During the nonpayment period, the appellant worked part-time for the employer. At this trial, the employer testified that he paid the appellant an average of $500 monthly. The appellant worked for the employer consistently for about seven hours a week, with some

5

weeks requiring more hours for larger jobs. The employer paid the appellant using an electronic payment application, and the appellant never indicated that he had not received a payment. The employer also testified that the appellant "has worked for other people" and may have been working for someone else about one day a week.

During this trial, the employer testified that the appellant started renting one of the employer's properties in January 2022. The employer stated that it was beneficial to have a "skilled construction worker" live at the vacant property that needed repairs. As in the first trial, the employer testified that he charged the appellant $800 in monthly rent, a reduced rate from the property's market value rent of about $1,700 monthly due to ongoing renovations. At this trial, he added that between January and September 2022, the appellant received assistance from social services to pay "some rent" for five months. Since the appellant did not possess a valid driver's license, the employer would pick him up on workdays, or the appellant would arrange rides to the job sites from other workers.

At the close of the State's case, defense counsel moved for a judgment of acquittal. This time, defense counsel cited *Ashford v. State*, 358 Md. 552 (2000), asserting that, while the case was "not directly on point," "it is a criminal contempt case involving child support in which case the [Supreme Court of Maryland] found in that case that the State had lacked evidence that showed neither the individual had sufficient money to pay child support nor that he had the ability to earn sufficient money and willfully failed to work and pay." Defense counsel asserted that, under *Ashford*, the motion should be granted because "[t]here isn't any evidence shown that [the appellant] had any money additional to pay any child support in this matter."

6

The court denied the motion, explaining that the facts in *Ashford* were distinguishable. The court noted that, in *Ashford*, the State's sole witness was unaware of the defendant's financial or personal situation during the period of nonpayment. In contrast, the employer in this case testified about the appellant's "work for him, potential work for others, and availability."

During closing argument, the State argued that although the appellant "may not be making a ton of money[,]" he was employed and had the ability and capacity to work more. Thus, the appellant could make regular payments under the child support order. On the other hand, the defense argued that the appellant did not have the financial means to pay child support due to his meager monthly income and rental obligation. The defense asserted that there was no evidence about the appellant's ability to work and earn more than his current income.

The court found the appellant guilty. It imposed a sentence of one year of incarceration and suspended all, to run consecutive to the sentence in the first case, followed by five years of probation.

**STANDARD OF REVIEW**

Our Maryland appellate courts apply "a deferential standard when reviewing sufficiency of evidence that asks whether '*any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt.'" *State v. McGagh*, 472 Md. 168, 193 (2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In so doing, "[w]e do not measure the weight of the evidence[.]" *Taylor v. State*, 346 Md. 452, 457 (1997). Nor do

7

we ask ourselves if we "believe[] that the evidence at the trial established guilt beyond a reasonable doubt." *Dawson v. State*, 329 Md. 275, 281 (1993) (citations omitted).

Instead, "[i]f the evidence 'either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt[,]' then we will affirm the conviction." *Bible v. State*, 411 Md. 138, 156 (2009) (quoting *State v. Stanley*, 351 Md. 733, 750 (1998)). In accordance therewith, we view "the evidence in a light most favorable to the State, [and] also all reasonable inferences deducible from the evidence in a light most favorable to the State." *Smith v. State*, 415 Md. 174, 185-86 (2010).

## DISCUSSION

FL § 10-203(a) provides that "[a] parent may not willfully fail to provide for the support of his or her minor child." "Willful" is not defined in the statute.[3] When construing a statutory term, "[o]ur chief objective is to ascertain the General Assembly's purpose and intent when it enacted the statute." *Berry v. Queen*, 469 Md. 674, 687 (2020). The Supreme Court of Maryland summarized the pertinent guiding principles of statutory interpretation:

> We assume that the legislature's intent is expressed in the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word,

---

[3] "[T]here are two acceptable spellings" of willful, "'willful' and 'wilful[,]'" and "[t]he preferred spelling appears to be the former." *Deibler v. State*, 365 Md. 185, 188 n.1 (2001). In this opinion, we follow the convention used in *Deibler*: when quoting law using the one-l spelling, we shall quote the word as it appears, and "[o]therwise, we shall use the preferred spelling." *Id*. As noted *supra*, FL § 10-203(a) uses the preferred, two-ll spelling of the word.

clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.

Our inquiry is not confined to the specific statutory provision at issue on appeal. Instead, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute. To this end, it may be beneficial to analyze the statute's relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.

While not necessary in every instance, we often find it prudent to scrutinize the legislative history to confirm that our interpretation of the statute's plain language accords with the legislature's intent.

*Id*. at 687-88 (cleaned up and citations omitted).

## A.

## Meaning of "Willful"

We begin by discerning the ordinary meaning of "willful." When statutory terms are not defined in a statute, "we may consult a dictionary and give words their ordinary meaning." *Angel Enters. Ltd. P'ship v. Talbot Cnty*., 474 Md. 237, 271 (2021). "This is an essential starting point because the 'ordinary, popular understanding of the English language dictates interpretation of [the statute's] terminology.'" *Berry*, 469 Md. at 688-89.

When FL § 10-203(a) was enacted in 1984, the legal definition of "willful" was "[p]roceeding from a conscious motion of the will; voluntary. Intending the result which actually comes to pass; designed; intentional; not accidental or involuntary." WILLFUL, Black's Law Dictionary (5th ed. 1979). "A willful act may be described as one done intentionally, knowingly, and purposefully, without justifiable excuse, as distinguished from an act done carelessly, thoughtlessly, heedlessly, or inadvertently." *Id*.; *see Romeka*

9

*v. RadAmerica II, LLC*, 485 Md. 307, 325-26 (2023) (considering the dictionary definition in effect at the time the relevant statute was enacted); *Hannah v. State*, 260 Md. App. 701, 720 n.9 (2024) (same).

The Supreme Court of Maryland has "attempted to define what 'willful' or 'willfully' means on several occasions." *Frazier v. McCarron*, 466 Md. 436, 450 (2019). The Court noted that the word "willful," in one form or another, appeared 547 times in the Maryland Constitution, Code, and Rules in various contexts. *Deibler v. State*, 365 Md. 185, 192 (2001). It also noted that the United States Supreme Court had declared the word a "word of many meanings" and that its context often influenced its construction. *Id.* (citation omitted). From a survey of our prior cases, the Supreme Court of Maryland observed that most, though not all, of the interpretations required "only that the act be committed intentionally, rather than through inadvertence." *Id.* at 195. The Court ultimately concluded, however, that when construing the word as a statutory term, we must give the term "the contextual meaning most probably intended by the Legislature, and, if the term is not susceptible to a single common meaning, we must look at relevant legislative history in an attempt to discern that intent." *Id*.

Before exploring the relevant legislative history, we find it helpful to look to the context in which the word has been used in situations involving nonpayment of child support. *See Berry*, 469 Md. at 690 ("In order to interpret a word's specific meaning in a particular statute we look to the context in which the word is used." (citation omitted)).

10

*i.*

*Dorsey v. State* & *Ashford v. State*

Our Supreme Court has examined willfulness in the context of criminal contempt for nonpayment of child support. Criminal contempt is a common law offense "inherent in all courts as a principal tool to protect the orderly administration of justice and the dignity of that branch of government that adjudicates the rights and interests of the people."[4] *Smith v. State*, 382 Md. 329, 337 (2004). "Criminal contempt[] may be direct or constructive." *Ashford*, 358 Md. at 563. "Direct" criminal contempt has been defined as conduct that occurs in the court's presence or so near the court that it interferes with its proper function and authority. *Id*. (citing Md. Rule 15-202(a)). An "indirect" or "constructive" criminal contempt is any contempt other than a direct contempt. *Id*. (citing Md. Rule 15-202(a)).

"[I]n order to convict an accused of constructive criminal contempt, [the State] has the burden of proving, beyond a reasonable doubt, a deliberate effort or a willful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court[.]" *Dorsey v. State*, 356 Md. 324, 352 (1999) (citation and internal quotations omitted). Only conduct "that is *willful or intentional* may constitute a criminal contempt." *Ashford*, 358 Md. at 563 (emphasis added).

The Supreme Court of Maryland explained the *mens rea* requirement in a case involving an alleged failure to comply with an order to pay child support:

---

[4] Maryland Rule 15-205(a) provides that "[a] proceeding for constructive criminal contempt shall be docketed as a separate criminal action." The State's Attorney is among those who may initiate a proceeding for constructive criminal contempt. Md. Rule 15-205(b).

11

> Whether a defendant has failed to pay court[-]ordered support when he or she had the ability to do so and whether that defendant has, in bad faith, caused his or her own . . . inability to comply, with the intent of frustrating the court order, are material, and, indeed, necessary, considerations bearing on whether a defendant should be punished [for contempt.]

*Lynch v. Lynch*, 342 Md. 509, 528-29 (1996).

> While ability to comply with a court order at the time of the alleged criminal contempt is not directly an element of the offense, evidence of an ability to comply, or evidence of a defendant's conduct purposefully rendering himself unable to comply, may, depending on the circumstances, give rise to a legitimate inference that the defendant acted with the requisite willfulness and knowledge. By contrast, evidence of an inability to comply during the relevant period may, again depending upon the circumstances, support an inference that the defendant lacked a contumacious intent.

*Dorsey*, 356 Md. at 352 (citing *Lynch*, 342 Md. at 528-29). "These *mens rea* elements must be established by evidence, and cannot simply be assumed. Nevertheless, like scienter generally in criminal cases, they may be proven by circumstantial evidence and by inferences drawn therefrom." *Id.* (citation and internal quotations omitted).

Two cases applied this framework for willfulness: *Dorsey v. State*, 356 Md. 324 (1999), and *Ashford v. State*, 358 Md. 552 (2000). *Dorsey* involved two defendants, Dorsey and Craft, who had been convicted of criminal contempt for their failure to pay court-ordered child support. 356 Md. at 354. Dorsey was convicted based on the lack of support payments for ten months, the absence of employment information in the agency's records, and the fact that the agency's records reflected an incorrect address for Dorsey. *Id*. The Supreme Court of Maryland held that these facts could not support an inference that Dorsey's failure to make support payments was willful and done with contumacious intent. *Id*. The Court explained that there was a lack of evidence of Dorsey's ability to pay:

12

> The only evidence relating to the period was Dorsey's testimony that he worked "a couple of weeks at Wendy's," that the pay was "[n]ot that much," and that, during the remainder of the period since August 1996, he was either incarcerated or, when not incarcerated, he was unable to find work and "basically" did "nothing."

*Id*. at 354-55.

Craft was convicted on the theory that he could have obtained a better job despite losing his driver's license. *Id*. at 355. The only evidence supporting this finding was the trial court's purported judicial notice that Craft could "probably make $240 a week working at one of the fast food places." *Id*. The Supreme Court noted, however, that:

> There was no "evidence" relating to the employment opportunities at the fast food places, Craft's qualifications for a job at these establishments, the wages available at such places, the distance between Craft's residence and the fast food places, or the availability of public transportation.

*Id*. Accordingly, the Court determined that the evidence was "wholly insufficient to support an inference that Craft's failure to comply was accompanied by a contumacious intent." *Id*.

Similarly, in *Ashford v. State*, 358 Md. 552 (2000), the Court held that the evidence could not support a criminal contempt conviction for nonpayment of child support:

> [T]he State's evidence showed neither that [Ashford] had sufficient money to pay the child support order nor that he had the ability to earn sufficient money and wilfully failed to work and pay. In fact, the State's sole witness testified that she was not aware of [Ashford's] financial or personal situation since . . . the time that [Ashford] made his last child support payment. Thus, in limiting its proof to lack of compliance with the order, the State has failed to offer sufficient evidence to prove the crime of constructive criminal contempt beyond a reasonable doubt.

*Id*. at 574. The Court concluded that "[t]he record [was] simply devoid of any evidence that [Ashford's] failure to pay was deliberate or wilful." *Id*. at 572.

13

*ii.*

*Walker v. State*

In *Walker v. State*, 234 Md. App. 160 (2017), this Court examined willfulness in a case in which the defendant was charged with criminal contempt for not paying court-ordered child support and the statutory offense for willfully failing to pay child support under FL § 10-203(a). *Id*. at 163-64. Although we did not expressly define "willful" under FL § 10-203(a), we concluded that there was sufficient evidence of willfulness to support the convictions for both offenses. *See id.* at 168-71. We analyzed the evidence as follows:

> Although establishing an affirmative intent to not do something is a difficult task, there was enough evidence for the jury to infer willfulness on [Walker's] part. . . . [Walker] signed two consent orders acknowledging the existence and magnitude of his obligation. Nevertheless, despite being fully aware of his obligation, he repeatedly failed to make the required payments and allowed the amount he owed to increase up to $68,000.
>
> Furthermore, unlike [in *Dorsey* and *Ashford*], there was evidence regarding [Walker's] financials during some of the relevant periods. Testimony at trial established that [Walker] worked for a landscaping company and earned income during at least seven of the months that he did not pay child support. In contrast with *Dorsey* and *Ashford*, we know that [Walker] was earning income at certain points and still not paying child support. Meanwhile, [Walker] was living with his mother and paying her rent.
>
> During periods of unemployment, [Walker] claimed that he was always looking for work, but when questioned about it he said he looked for jobs only two or three times a month. Looking for a job only two or three times a month is not equivalent to always looking for work. For someone who owes such a substantial amount in child support, that is not an adequate effort at obtaining employment.
>
> Moreover, [the mother's] testimony about her communications with [Walker] also show a pattern of deliberate non-payment. [The mother] testified that she would tell [Walker] over the phone that he needed to make his child support payments, and that he also promised her that he would. Nevertheless, he repeatedly failed to honor these promises to pay. . . .

14

[Walker's] regular awareness that he was supposed to do so, his guarantees that he would do so, and his consistent and repeated failure to do so, permitted an inference that he *knowingly and intentionally* did not do so.

*Id*. at 170-71 (cleaned up and emphasis added). We held that "[t]aken all together, [Walker's] knowledge of his obligations, promises to pay, employment history, and repeated failure to pay supports the jury's conclusion that [he] willfully failed to pay his required child support."[5] *Id*. at 171.

Although undefined in *Walker*, we characterized "willful" under FL § 10-203(a) as an act done "knowingly and intentionally." *See id.* This is consistent with the legal definition of the word. *See* WILLFUL, Black's Law Dictionary (5th ed. 1979) ("A willful act may be described as one done intentionally, knowingly, and purposefully, without

---

[5] Although we combined the analysis of the evidence for both the common law offense of criminal contempt and the statutory offense under FL § 10-203(a), we noted that "the two crimes serve different purposes." *Walker*, 234 Md. App. at 172. The purpose of the child support statute is "to assist spouses and children in directly procuring support and thereby preventing them from becoming public burdens, to punish the offense of failing to provide support, and, by the fear of punishment, to prevent the commission of such an offense." *State v. Berry*, 287 Md. 491, 497 (1980). Criminal contempt is a common law offense "inherent in all courts as a principal tool to protect the orderly administration of justice and the dignity of that branch of government that adjudicates the rights and interests of the people." *Smith*, 382 Md. at 337.

As stated, to prove criminal contempt, the prosecutor has the burden of proving "a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that *it would frustrate the order of the court*[.]" *Dorsey*, 356 Md. at 352 (citation omitted and emphasis added). *Dorsey* appears to use "wilful" interchangeably with "contumacious intent." *Id*. ("[E]vidence of an inability to comply during the relevant period may, again depending upon the circumstances, support an inference that the defendant lacked a *contumacious intent*." (Emphasis added)). As the State observes, to the extent that the analyses of willfulness and contumacious intent overlap, contumacious intent to frustrate the court's order is specific to the contempt context and is lacking from the statutory offense under FL § 10-203(a).

justifiable excuse, as distinguished from an act done carelessly, thoughtlessly, heedlessly, or inadvertently.").

We now turn to the legislative history of FL § 10-203(a) to confirm that our interpretation of "willful" accords with the legislature's intent.

**B.**

**Legislative History of FL § 10-203(a)**

FL § 10-203(a) shares a common origin with its statutory counterpart for nonpayment of spousal support under FL § 10-201(a) ("A spouse may not willfully fail to provide for the support of the other spouse, without just cause."). In 1896, Maryland enacted § 47A to criminalize the desertion and non-support of wives and children. 1896 Md. Laws, Ch. 73, § 47A ("Desertion of Wife or Child"). "While one purpose underlying the criminal non-support laws was to protect wives and children from becoming public charges, the primary objective was 'to provide directly for unsupported wives and children, and to punish this offense [of non-support] against them, and by fear of punishment to prevent the committing of such offenses.'" *Cruickshank-Wallace v. Cnty. Banking and Tr. Co.*, 165 Md. App. 300, 325 (2005) (citation omitted).

Section 47A made it a misdemeanor for a person to "without just cause desert or *wilfully neglect* to provide for the support and maintenance of his *wife or minor child*[.]" 1896 Md. Laws, Ch. 73, § 47A (emphasis added). In the 19th century, although not defined in Section 47A, the term "willful neglect" had a specific meaning. The 1891 edition of Black's Law Dictionary defined the term as "the neglect of the husband to provide for his wife the common necessaries of life, he having the ability to do so; or it is the failure to do

16

so by reason of idleness, profligacy, or dissipation." WILLFUL NEGLECT, Black's Law Dictionary (1st ed. 1891).[6]

*i*

*Recodification into Article 27, § 96*

In 1951, the criminal non-support laws were recodified in Article 27, § 96, and the section criminalizing the nonsupport of wife and child was divided into two subsections. *See* Md. Code (1951), Art. 27, § 96(a), (b). Section 96(a) criminalized the desertion and nonpayment of spousal support: "Any person who shall without just cause desert or *wilfully neglect* to provide for the support and maintenance of his *wife* shall be deemed guilty of a misdemeanor[.]" (Emphasis added). Subsection (b) criminalized the desertion and nonpayment of child support: "Any parent who shall desert or *wilfully neglect* to provide for the support and maintenance of his or her *minor child* shall be deemed guilty of a misdemeanor[.]" (Emphasis added).

In *Ewell v. State*, 207 Md. 288 (1955), the Supreme Court of Maryland interpreted the term "wilfully neglect" under Art. 27 § 96(a) in a case involving the nonpayment of spousal support. *Id.* at 293. There, the husband had not paid spousal support due to a lack of funds. *Id.* at 298. The husband's testimony suggested that he refused to pay support because his wife would not grant him a divorce. *Id.* The husband had made constant efforts

---

[6] The word "wilful" by itself was then defined as "[p]roceeding from a conscious motion of the will; intending the result which actually comes to pass; designed; intentional; malicious." WILFUL, Black's Law Dictionary (1st ed. 1891) ("In common parlance, 'willful' is used in the sense of 'intentional,' as distinguished from 'accidental' or 'involuntary.'"); *see also* WILFULLY, Black's Law Dictionary (1st ed. 1891) ("willfully" defined as "[i]ntentionally").

to obtain employment and had been unable to find any. *Id*. at 299. The evidence also established that the husband rented an apartment but did not occupy it, and he maintained a club membership without giving any financial support to his wife. *Id*. His testimony indicated that he could have paid his wife $20 monthly during that period. *Id*. In a bench trial, the court found the husband guilty of willful failure to pay spousal support. *Id*. at 291.

In determining whether the husband's failure to support his wife was "wilfull," the Court construed the term "wilfully neglect" under § 96(a) to mean "wilfully fail":

> *To be guilty under the statute*, the husband must *wilfully fail* to provide for his wife without just cause. *The term "wilfully" in criminal statutes has been said "to characterize an act done with deliberate intention for which there is no reasonable excuse."*
>
> If the conviction is to be sustained, there must have been testimony from which the trier of the facts could have determined that the husband intentionally refused to support his wife, although he had the capacity to do so. The cases have held that *wilful failure* to support presupposes the existence of, or the ability to obtain, the means of support by the husband. He must have the means or the capacity to obtain them. . . . [R]egardless of the small amount actually being earned by the husband, if he has earning power, he must support his wife. . . . [T]he court may consider the earning power of the husband and is not restricted to his actual earnings.

*Id*. at 299 (cleaned up and emphasis added).

Based on the evidence, the Court affirmed the trial court's finding that the husband willfully failed to pay support to his wife. *Id*. at 301. It explained:

> The evidence in this case shows that the husband had been successful all of his life in earning relatively large sums of money. There is no showing that his health would not permit him to work and the trial court, taking into account his experience and intelligence, could not unreasonably have found that employment, which would afford reasonable compensation to him, was available if he earnestly desired it. Too, we cannot say that the trial court was clearly erroneous in its conclusion that the appellant's failure to support his wife was because he neither desired nor intended to do so as long as she

18

refused to divorce him. These two findings would sustain the conclusion that his conduct was wilful within the meaning of the statute.

*Id.*

*ii.*

*Recodification into Article 27, § 88*

In 1957, the General Assembly recodified the non-support statutes in Article 27, § 88. Md. Code (1957), Art. 27, § 88. Section 88(a) continued to criminalize the nonpayment of spousal support. After various non-substantive changes to the text over the years, the section read: "Any person who without just cause *wilfully neglects* to provide for the support and maintenance of his or her *spouse* is guilty of a misdemeanor."[7] Md. Code (1957, 1982 Repl. Vol.), Art. 27, § 88(a) (emphasis added).

Section 88(b) continued to criminalize the nonpayment of child support. After various non-substantive changes to the text over the years, it read: "Any parent who deserts or *wilfully neglects* to provide for the support and maintenance of his or her child under the age of 18 is guilty of a misdemeanor[.]" Md. Code (1957, 1982 Repl. Vol.), Art. 27, § 88(b) (emphasis added).

*iii.*

*Recodification into the Family Law Article*

In 1984, the General Assembly recodified Art. 27, § 88(a) and (b) in Title 10, Subtitle 2 of the Family Law Article. Section 88(a) for the nonpayment of spousal support

---

[7] The text was changed to remove the criminal prohibition against desertion of the wife (*see* 1977 Md. Laws, Ch. 213 at 1852) and extend the criminal prohibition against non-support to all spouses, not just to the wife (*see* 1978 Md. Laws, Ch. 921 at 2703-04).

19

was recodified without substantive change in FL § 10-201(a). *See* 1984 Md. Laws Ch. 296 at 2134. The Revisor's Note explains that the word "fail" was substituted for the former word "neglects" "in light of *Ewell v. State*, 207 Md. 288 (1955)[,]" *supra*. *Id*. FL § 10-201(a) thus reads, "A spouse may not *willfully fail* to provide for the support of the other spouse, without just cause."

Section 88(b) for the nonpayment of child support was recodified without substantive change in FL § 10-203(a). *See* 1984 Md. Laws Ch. 296 at 2136. FL § 10-203(a) currently reads: "A parent may not *willfully fail* to provide for the support of his or her minor child." (Emphasis added). Notably, the Revisor's Note explains that the word "fail" replaced the former word "neglects" "to conform to [FL] § 10-201[.]" *Id*. The word substitution is significant because it reflects the General Assembly's intent to interpret the term "willfully fail" consistently under FL § 10-201(a) and § 10-203(a). *See Davidson v. Koerber*, 454 F. Supp. 1256, 1260 (D. Md. 1978) ("Although the Revisor's Notes are not law, . . . they are strong and persuasive evidence of the legislative intent.").

Based on the legislative history of the non-support statutes, we conclude that "willfully" under FL § 10-203(a) describes "an act done with deliberate intention for which there is no reasonable excuse[,]" as interpreted in *Ewell*. *See Ewell*, 207 Md. at 299. The interpretation aligns with the legal definition and our characterization in *Walker* as an act done "knowingly and intentionally." This conclusion also adheres to well-established canons of statutory interpretation. *See Whack v. State*, 338 Md. 665, 673 (1995) ("When we are called upon to interpret two statutes that involve the same subject matter, have a common purpose, and form part of the same system, we read them *in pari materia* and

20

construe them harmoniously."); *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024) (noting that after looking to the dictionary definition of an undefined statutory term, the Court "broaden[s] [its] analysis to consider the other language of the provisions in which the terms appear" within the statute).

## C.

### "Willful" Under FL § 10-203(a)

In considering the legislative history and decisional law, we interpret "willful" under FL § 10-203(a) just as the *Ewell* Court did, meaning "an act done with deliberate intention for which there is no reasonable excuse[.]" *See Ewell*, 207 Md. at 299; *accord Walker*, 234 Md. App. at 171 (characterizing willfulness as an act done "knowingly and intentionally"); WILLFUL, Black's Law Dictionary (5th ed. 1979) ("A willful act may be described as one done intentionally, knowingly, and purposefully, without justifiable excuse[.]"). Accordingly, consistent with *Ewell*, we hold that to support a conviction for willful failure to pay child support under FL § 10-203(a), there must be evidence from which the trier of the facts can determine that the obligor parent intentionally refused to support their child despite having the capacity to do so. *See Ewell*, 207 Md. at 299. Willful failure to support presupposes the existence of, or the ability to obtain, the means of support by the parent. *See id*. In other words, the obligor parent must have the means of paying support *or* the capacity to obtain the means of paying support. *See id*. Willfulness may be proven by circumstantial evidence and by inferences drawn therefrom. *See Dorsey*, 356 Md. at 352.

21

Our holding clarifies and confirms how this Court in *Walker* understood willfulness under FL § 10-203(a), consistent with the considerations outlined in *Ewell*. In concluding that the evidence in *Walker* was sufficient to support willfulness under FL § 10-203(a), we took into account the fact that the obligor parent earned income for at least seven months without paying support and used his income to pay rent (means of paying support). We also considered his employment history (capacity to obtain the means for paying support), among other relevant evidence of his knowing and intentional failure to pay child support (*i.e.*, unfulfilled promises to pay).

We now turn to the two cases and evaluate whether the evidence in each was sufficient to prove willfulness under FL § 10-203(a).

**D.**

**Analysis**

*i.*

*First Case: C-14-CR-22-000092*

The appellant argues that the evidence was insufficient to prove his failure to pay child support was willful. He contends there was neither evidence of "substantial financial assets" from which he could have made payments nor evidence of "willful unemployment with the purpose of avoiding making support payments."

As stated, willfulness is an act done with deliberate intention for which there is no reasonable excuse. There must be evidence—direct or circumstantial—from which the trier of the facts can determine that the obligor parent intentionally refused to support their child despite having the capacity to do so (means of paying support *or* the capacity to obtain the

22

means of paying support). While a showing of "substantial financial assets" or "willful unemployment" to avoid making support payments can be compelling evidence of a parent intentionally refusing to support their child, neither is a prerequisite of proving the offense under FL § 10-203(a), as the appellant suggests. As the *Ewell* Court explained, "regardless of the small amount actually being earned by the husband, if he has earning power, he must support his wife. . . . [T]he court may consider the earning power of the husband and is not restricted to his actual earnings." *Ewell*, 207 Md. at 299 (citation omitted). We see no reason why the same principle should not apply in a case involving the willful failure to pay child support under FL § 10-203(a), especially considering the General Assembly's intent to construe "willfully fail" consistently with FL § 10-201(a).

The evidence was sufficient to demonstrate that the appellant willfully failed to pay child support despite having the capacity to do so during the nonpayment period of May 2021 and May 2022. The appellant worked between one to four days per week, which amounted to about 10 to 15 monthly jobs. Although there was no evidence about the exact amount of his monthly income, the jury could have concluded that he earned or otherwise had the means to pay $800 monthly rent. Despite having funds to pay rent, none was used to pay the child support obligation during the nonpayment period. *See, e.g.*, *Walker*, 234 Md. App. at 170 (father worked and earned income that he did not use to pay child support during the relevant period; meanwhile, he was paying rent); *Ewell*, 207 Md. at 299 (husband willfully failed to pay spousal support where he rented and continued his membership in a club while he was paying his wife nothing).

The appellant argues that his lack of a driver's license prevented him from going to work. The employer, however, testified that the appellant had been able to get rides to work and back or work at the employer's property that the appellant was renting. Despite the appellant's lack of a driver's license, he was consistently working 10 or 15 jobs per month.

Moreover, the evidence showed a strained relationship between the appellant and Mother 1. The appellant had not seen their child, who was six at the time of trial, since the child was a few months old. The appellant testified that he had made multiple attempts to contact Mother 1 during the nonpayment period to request "visitation rights" with the child. But his attempts to contact Mother 1 were unsuccessful because she had "blocked" him. A jury could have easily inferred that the appellant chose not to pay child support due to his frustration over Mother 1's refusal to allow him to see the child. *See, e.g.*, *Ewell*, 207 Md. at 301 (husband's failure to support wife because she refused to divorce him would sustain the conclusion that his conduct was willful). For the reasons stated, the totality of the evidence supports the inference that the appellant's failure to pay child support during the nonpayment period was willful.

*ii.*

*Second Case: C-14-CR-22-000093*

The appellant argues that the evidence in the second case was insufficient to establish that he was willful in failing to pay child support. He again contends that the State failed to prove the existence of "substantial financial assets" or that he willfully failed to work with the intent to avoid making payments. As explained above, such evidence is not a prerequisite to proving willfulness under the statute.

24

The evidence was sufficient to establish that the appellant willfully failed to pay child support despite having the capacity to do so during the nonpayment period of October 2021 through May 2022. As the circuit court found:

> [The appellant's] employer and landlord . . . testified that during the period of time for which [the appellant] is charged with nonsupport, [the appellant] worked for [the employer]. That [the appellant] was making approximately $500 a month. [The employer] was paying [the appellant] $19 an hour. That [the employer] paid him through a cash app.
>
> There was no indication that [the appellant] wasn't paid, and that [the employer] was aware, although he couldn't get any specific indication, that [the appellant] was doing jobs for other people and certainly that he had the ability to do jobs for other people and that [the employer] would like to see him do jobs for other people.
>
> So the [c]ourt thinks that there is sufficient evidence based on all that to find beyond a reasonable doubt that [the appellant] willfully failed to provide child support for his minor child.
>
> And he clearly–he is working. He clearly has the ability to work. He works for both [the employer] and for others. He is making some money a month. I guess it could be argued or is in dispute exactly the amount of that money but he does have income. He does have the ability to work, and for the months for which he is charged with nonsupport, he made absolutely no payment at all toward the support of his child.

The appellant again claims that his lack of a driver's license prevented him from working, but the employer testified that he and others would transport him to work. Despite working and earning money, the appellant chose not to use any of his income to pay child support. Viewing the evidence in the light most favorable to the State, we conclude that the evidence adduced in the second case was sufficient for the court to find that the appellant willfully failed to pay child support under FL § 10-203(a).

**JUDGMENTS OF THE CIRCUIT COURT FOR KENT COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**